United States Court of Appeals for the 11th Circuit. Hear ye, hear ye, hear ye. The United States Court of Appeals for the 11th Circuit is now open according to law. God save the United States and this honorable court. Good morning this is Judge Wilson in Tampa. Judge Marcus is here. He's in Miami and Judge DePauw is in Kentucky. I'd like to thank Judge DePauw for assisting us in deciding these appeals this morning. Judge Marcus and I had hoped to welcome you personally in Miami, Judge DePauw, but obviously present circumstances made that arrangement unwise, but we do appreciate your assistance today and in the Mr. Maycock of the Circuit Executive's Office advises me that counsel are present and they're ready to proceed. Ms. Tisa is our courtroom deputy and she's also the timekeeper and she will let us know when the yellow light is on, meaning that there's two minutes left for counsel to argue and she will let us know when time is up, when the red light is on. I would advise counsel that the previously conferred about these appeals that are scheduled for oral argument this morning, but we've read the briefs and we've examined the relevant parts of the record if that will assist you in confining your arguments to the issues on appeal. The first case to be argued this morning is the United States of America versus Stephen Chalker and Mr. Finn, Leonard Finn, is here for Chalker. Good morning, judges. Pleasure to be here and thank you for this opportunity. I represent appellant Stephen Chalker who was a newly minted pharmacist convicted of conspiracy to commit Medicare fraud and two counts of substantive fraud. The first issue that I would like to discuss is the fact that the government failed to prove its case. They alleged and so had to prove that the prescriptions at the time were medically unnecessary and or never provided, but no evidence, no competent evidence was introduced from which such conclusions could reasonably be inferred. The evidence essentially was the opinions of the pharmacy benefit managers. There were three of them. Each of them based their opinions on the same type of data which was insufficient to sustain the conclusions necessary for the conviction. The second expert who testified, Captain Norton, one of the non-disclosed experts and testified as to their position on medical necessity. Medical necessity is going to require the doctor interacting with their patient, evaluating that patient, taking maintaining notes and treatment records of the patient. Captain Norton was discussing the doctor's actions which are obviously between the doctor and the patient and doctor's records which are not supplied to pharmacists. Well let me ask you this counsel now. He prepared these pre-printed prescriptions himself that were submitted to the doctors. Is that right? Well judge they weren't exactly pre-printed prescriptions. What they were were forms much like we submit proposed orders which contained printed prescriptions, more than one, plus a blank form in which the doctor could put in any prescription that he chose. So our... Did he lie to the, was there testimony at the trial that he lied to these benefit managers about the true owner of POPs in order to avoid termination of the contract that he created pre-printed prescriptions for expensive compounds and topicals that should have been created by the doctors based on the individual needs, the medical needs of the patients? Judge, I'm sorry. The concern that I have is he the proposition that a defendant who testifies runs the risk that the jury will disbelieve this testimony. Isn't the jury entitled to disbelieve Mr. Chalker when he denied that he didn't know he was participating in a, in a, in a conspiracy to submit fraudulent claims to the government? Isn't the jury entitled to disbelieve him if he testifies at the trial? They are, your honor, but in this case, which is rare in my opinion, neither probation, the prosecution, nor the judge assessed the obstruction of justice penalty for a lying witness or a lying defendant. Our argument is not that Mr. Chalk... Counsel, this is Judge Zappar, but that, that often doesn't happen. Judges often don't obstruct, apply the obstruction enhancement when a defendant testifies and convict, was that could ultimately create constitutional problems, as you know, and as the case law says, if they automatically applied it. And here you're arguing sufficiency. So it seems to me we view it in the light most favorable to the government. And why wouldn't the testimony Judge Wilson referenced, plus the fact that patients were sending back these prescriptions and scripts saying they never asked for them, weren't paying, things like that. Why couldn't a witness' evidence conclude that your client was involved? Well, Judge, let me see if I can break down your question. With regard to the patients, the only evidence was two patients who testified, neither of whom indicated they had any interactions with Mr. Chalker. There was no evidence that Mr. Chalker, let me rephrase that, the only evidence regarding patients that did communicate with Mr. Chalker was that he would routinely allow chargebacks if there were any complaints about the prescriptions whatsoever. The fact that the opinion, our argument is that the opinions were based on incomplete data. As each of the PBM witnesses testified, they never saw a prescription. No patient's records in evidence. Their conclusions were based upon inferences that were not supported by what they were entitled to see. The prescription information that they saw, not the prescriptions, contained only the active ingredient. And from that, they concluded that there wasn't enough material in POP's inventory to justify the amount that was billed for, and B, the prescriptions, they were all the same. But as we argue, and as they admitted in their testimony, for example, Dr. Thatcher testified, I do not have the specific ingredients for all of these records. I can't say without a doubt that all of these prescriptions were exactly the same. So the conclusion that the prescriptions were unnecessary because they were all the same is not supported by the government's evidence. Similarly... Did he admit at the trial that he knew about the complaints by patients that they didn't want certain prescriptions or they didn't receive the medications? Judge, my recollection is that the process, the first answer is he admitted that there were some patients who, through POP's process, were eventually referred to him, and that when there was an issue with those individual patients, he would cancel the prescriptions and refund the billing. There was no testimony that the process was that he was the individual who routinely received the complaints, nor is there any testimony as to whether he received one complaint, two complaints, or hundreds of complaints. There were at least 5,000 patients, and so our contention is that the fact that there were some unknown amount of complaints received, which he dealt with appropriately, does not support guilty knowledge. Was there testimony at the trial that he knew that co-pays were being waived routinely? Well, no, Judge. The testimony at trial was that there was a billing department and that the procedure was the billing department would collect co-pays before even envelope, but for co-pays that were less than $5.00. Those prescriptions were shipped with a bill and a stamped address envelope so that the patient could pay the co-pay. None of the co-pays were routinely waived, and as we indicated, part of our other issue, the cumulative effect of the preserved and government glossed over the fact that it's not necessarily a crime and it's not necessarily a red flag of fraud for co-pays to be waived. If I may, I'd like to switch over to the combined error argument, all of which were exacerbated by the denial of our three motions for continuance, one of which was a joint motion by the government. The errors, which together denied us a fair trial, were the late disclosed and the non-disclosed experts, which essentially was the government's entire case. The government responded to this by claiming that two of the three PBM experts that weren't disclosed, that non-disclosure was excused because they indicated in their one disclosure and in response to our motion in limine to exclude such testimony that there would be other experts who were relying on different databases. The fact that they were relying on different databases is precisely why the failure to disclose the experts and their opinions and the source of their opinions was harmful and in conjunction with the other errors denied us a fair trial. Second, the government failed to ever correct the testimony that all waivers of co-pays were red flags of fraud and as we indicated and as the jury instruction noted based on the regulation that's simply not the case. The problem was that was just too little and too late at that time given the never-ending references to the claimed 100% waiver of co-pays. The next part of the cumulative error is the late disclosed patient files that were in the possession of Mr. Leiva, the including two separate hard drives which were never accessed because there was no computer available to access the hard drives. This information was each patient file which was supposed to expire. Thank you. All right, Mr. Finn, have you reserved some time for rebuttal? I did. All right, well we'll hear from you on rebuttal. Thank you and Ms. Vickery, Sophia Vickery is here for the jury. Are you ready to proceed? I am. Thank you, Your Honor. May it please the court, Sophia Vickery for the United States. I think I'll start with the sufficiency of the evidence claim. There was ample evidence that Mr. Chalker, the pharmacist in charge of Pops Pharmacy, knowingly and voluntarily joined the conspiracy. The data shows numerous indicators of fraud. 92% of prescriptions at this community pharmacy were for topical compound creams. The vast majority of customers and prescribing doctors were from out of state, out of state. And prescriptions for compound creams, medications that should be customized and individualized, all have the same primary ingredients at the same quantity and at a very high average cost. Patient after patient complained to Pops Pharmacy about medications that they did not want and that they did not need. The pharmacy and Mr. Chalker also routinely raised co-pays to induce patients to the medication, which is an indicator of fraud. Is there any evidence that demonstrated that he was aware that the co-pays were not being collected? Yes, Your Honor. Mr. Chalker is copied on a number of emails discussing the co-pay waivers. He is also was aware of it in from his discussions with Ms. Thomas, the And Mr. Oliva testified that it was a common practice at the pharmacy to waive those co-pays in order to induce the patient to accept the medication. What about counts three and four? This is Judge Sipar, I'm sorry. What evidence can you point to that specifically ties him to those claims? So the jury could infer that there's a couple of theories. The jury could infer that Chalker was guilty as the principal. He was the pharmacist in charge of this pharmacy and responsible in that role for all of the prescriptions at the pharmacy or for aiding and abetting the employees that he supervised. Can that be right, though? I mean, you're not there 24-7 or you're not there all the time. So how can they just infer that he would be responsible for every prescription ever issued? Well, he is a pharmacist in charge and in that role, part of that role is a But that seems like, I'm sorry to interrupt you, but doesn't that seem like vicarious criminal liability to hold the pharmacist in charge for everything that happens under, arguably under their watch, even if they don't know about it? I don't believe so in this context, Your Honor, because it's not as though the things that are happening at the pharmacy are unconnected to his role. They are, in fact, the essence of what the pharmacist in charge is supposed to I'd also point to the Pinkerton instruction that was given where Mr. Chalker was liable for the reasonably foreseeable crimes committed during and in furtherance of the conspiracy. Is there any specific evidence that would show that Chalker knew that any of these three people who claimed that they never asked for and received products that they didn't want, that Chalker was aware of that? Or do we have to infer that circumstantially or use Pinkerton to basically attribute it to him? I'm sorry, are you referring to the two substantive counts? Yes. Yes. Yes. So I think that you would need to infer it from his role in the pharmacy that he was aiding and abetting or through the Pinkerton instruction. There was testimony that Cynthia Campbell's caregiver repeatedly called the pharmacy to complain and was hung up on or otherwise that the person who she talked to was non-responsive. But, of course, we don't know. The person didn't know that it was Mr. Chalker that she spoke to. Is there evidence that he lied about Leva's ownership? Yes, Your Honor. And what evidence is there about that? I point to Government Exhibit 11C, which is the paperwork that he submitted to Express Scripts, where he listed himself as the owner. I'd also point to Mr. Chalker had discussed that because Mr. Leva was a convicted felon, they needed to hide his ownership and his identity, not include him on emails with the pharmacy benefit managers, because they knew that if those companies knew that Mr. Leva was the owner, they would not want to do business with the pharmacy. That might circumstantially tie into a general conspiracy to defraud. But how would that tie him to Counts 3 and 4, other than using Pinkerton? Your Honor, I think it would through... I think Pinkerton is the answer or in his role as a pharmacist in charge, rather than sort of the specific paperwork. Do we know how many prescriptions were filled during the relevant timeframe? I don't have a number for you. I ask the question because Mr. Fenn made reference to, in another context, the 5,000. I'm not sure which... what the 5,000 number he is referring to. I thought that it might be the patient files and the discovery boxes in the file cabinet, but I'm not sure what that number refers to. How many other pharmacists operated out of POPs? Actually did create prescriptions, fill prescriptions, other than the defendant, Stephen Chalker? I believe that there was a technician employed, as well as, like, a manager and marketing personnel. I'm not sure... My question is a different one. Were there any other pharmacists, licensed pharmacists, on duty during the relevant timeframe, other than Stephen Chalker? Your Honor, I don't believe so, but I cannot tell you for sure whether the technician who was employed was... actually had a pharmacist license or not. I just... I don't know that information. This is... this is Judge Wilson. I know the Levas were indicted and they both pled guilty. Were there... are you... is the government able to tell us whether or not any doctors were indicted? Your Honor, I don't believe that they were. Okay. Isn't medical necessity a determination made by a doctor and not a pharmacist? Your Honor, it could be in some cases, but in the evidence in this case, it's pretty obvious that these prescriptions were not medically necessary. You can see that from the data about the types of prescriptions that they were. We also have that from... from Mr. Chalker himself, that he picked the ingredients that go in the formulas and he picked them based on what was most expensive. That's a concern that I have because when I look at the evidence in this case, it suggests... you used the word, it was obvious that he... maybe Chalker... I have is the government was able to prove beyond a reasonable doubt that Mr. Chalker should have known that false claims were being submitted to the government. But I'm looking for evidence in the record that he actually knew that false claims were being submitted to the government rather than evidence that suggests that he should have known. What's the best evidence? If I go to the evidence, does it demonstrate that he actually knew rather than he should have known? I point to a couple things. First is that he was lying to the pharmacy benefit managers to hide the real ownership of Pops Pharmacy. Second, I point to the evidence about inventory shortages. So Pops Pharmacy was billing for drugs that they didn't actually have the supplies to fill. And from that, the jury could infer that the patients never received the drugs, never received the prescription claims that never actually went out. Mr. Chalker himself also created refills if the pharmacy was having a slow week. And there's testimony that he did that to, quote, offset the reversal. So when some of the pharmacy benefit managers would reverse claims, he would just put in a bunch of refills for lidocaine to make sure that the pharmacy numbers were up for that particular week. Let me ask you a question about medical necessity. It's a legal question holding aside whether the evidence is sufficient to tie the defendant to the alleged conspiracy and to count three and four. On the issue of medical necessity, would it be enough as a matter of law for a patient to say, I used this pharmacy. They sent me painkillers because I broke my arm. And what I was sent by the pharmacy was salve for a skin ailment, which I never had and I never needed. Would that be enough to establish medical necessity? Or do you need the testimony of a doctor? Do you need an expert opinion on the matter? Your Honor, I don't believe so. If a patient is looking for painkillers for a broken arm but receives cream for a skin rash, I don't believe you need a doctor to tell you that that's unnecessary. Thank you. If there are no more questions on the sufficiency of the evidence point, I might turn to the First, on the motion for continuance, it was not an abuse of discretion not to continue the trial. Mr. Chalker had 74 days to prepare, which was more than adequate. He also hasn't pointed or attempted to point to any specific or substantial presence. Let me ask you, what was the volume of records disgorged by the United States to Chalker? Do we have you been able to There is a discovery log reviewed in the trial record. I don't have it in front of me. It is a high volume of paper as typical in a health care fraud case. It was turned over timely according to the discovery order produced in the case. And Mr. Chalker hasn't identified what the specific or substantial prejudice would be, what relevant non-cumulative evidence he would have produced if he had been given more time. He also mentioned that the government joined one of the motions. I wanted to point out that the government joined the motion on August 17 and mentioned in that motion that we were joining it as a result of scheduling issues from trial counsel, not as a result of any of the other issues that Mr. Chalker complained of. And once the district court denied that motion, trial counsel adjusted their schedule and was able to proceed to trial on September 4. Mr. Fen, I'm sorry, also mentioned some of the expert issues. Just to clarify, the government's only expert was Ms. Thatcher. He referred to several of the other fact witnesses as experts. The government did not. Can I ask you about that? How is it fair to substitute an expert four days before? I mean, it seems to me you're prepping for a certain expert and then all of a sudden it switches. Why not at least give a brief continuance to prepare to cross-examine and understand that expert? So it's important in this case to note that Mr. Chalker never contested that expert's qualifications. He actually conceded in his motion that he was problematic, right? Because now I've got a qualified expert that I wasn't aware of that I now have to deal with in prepping cross-examination in addition to the large volume of documents you just turned over for which a continuance was denied. Counsel, two minutes. Two minutes, counsel. I do think the fact that Mr. Chalker did not need to cross-examine her about her qualifications or was not concerned about her qualifications makes the prejudice less in this case because he was aware already of all of the substantive topics that she would testify about and had been able to prepare to cross-examination and materials on those other topics. And so the only change was actually just in the individual who would be describing those topics. To the extent he didn't have any concerns about her qualifications or experience, he didn't need to prepare cross-examination. On that issue and was able to use everything he'd already been preparing on the same topics about the same data set as the originally known as expert. Well, let me just probe a little bit further about that if I can. The new expert who testified, Thatcher, was the substance of Thatcher's testimony the same as what was contained in the report from the original expert who was not called? Yes, with one exception. She did not, it was a narrower subset. She did not testify on the invoice reconciliation topic, which had been the basis of Mr. Chalker's original objection. The government made a decision to have the pharmacy benefit manager's witnesses testify on that topic and have the foundation, the methodological foundation utilized by Thatcher the same as what was contained in the original report of the expert? Yes. So the only difference was one item that was in the first was omitted in the second actual testimony? Correct, and it was a different person. If the court has no further questions, the government will rest on its brief. Thank you, Ms. Vickery. Thank you. And Mr. Finn, you've reserved some time for rebuttal. Good morning again. In rebuttal, number one, with regard to the... Mr. Finn, let me ask this. Mr. Finn, this is Judge Mark. It's just one quick question. With regard to the 74 days that elapsed between the appointment and the trial itself, was there any showing of prejudice that your client sustained, specific prejudice that you could point us to? Judge, part of the specific prejudice that we pointed to was our inability to secure our own expert regarding his salary vis-a-vis the industry. We also noted that the 5,000 patient files that were very lately disclosed contained information that could have been valuable. It was supposed to have the exact prescriptions, the notes on co-pays entered into the file by patient calls, any input from doctors, and notes about chargebacks. All of this also could have... I guess I'm not... I guess... Let me just ask you about the first thing that you referenced. You said that the continuance prejudiced you because you were unable to get an expert as to salary. I'm not sure I understand that. You know that they were originally calling an expert, and the report had been given to you from the original expert. Weren't you free to retain your own expert at that point? Yes, Judge. The expert that was disclosed was not the financial analyst, however. They claimed that person was not an expert, just as they claimed the other two financial benefit managers who also testified... I'm sorry. I'm not asking about... I know you raised a separate issue. They put on someone who they might otherwise have qualified as an expert, but they offered that person as a lay summary witness. I'm not asking about that. I'm asking about your ability to get an expert to controvert the expert opinion offered by Thatcher, which apparently was contained in the original expert report from the first expert the government had proffered. I did not raise that issue, Judge. The lack of expert I was referring to had to do with the nondisclosed financial expert. Okay. I'm sorry. So you're talking... That issue is with respect to... They put on someone who they could have qualified as an expert, did not, and she offered summary testimony, right? She offered summary testimony. I believe she also testified regarding Mr. Chalker's salary as being within or without the range of other pharmacists, which would have been an expert opinion, not a summary. But our issue with regard to the nondisclosure of experts really went to the other PBM managers, only one of which, even though substituted at the last second, was disclosed. And the government even just argued that they were going to testify as to the same kind of analysis that the disclosed expert did, but were never disclosed. That was one of the cumulative errors. And with regard to the question that was asked regarding the patient with a medication, that illustrates why we feel the government's evidence was simply insufficient. No pharmacist, and certainly not Mr. Chalker, would have been informed that the patient had a broken arm. All Mr. Chalker would have seen was a prescription valid from a doctor, and he has no knowledge of the relationship between the doctor and the patient. So he would have just fulfilled the prescription as given by a doctor, and would never know that there was any kind of an issue regarding a broken arm, unless and until a patient called and spoke with him, and there was simply no evidence of that. So the cases say that if the defendant is unprepared, he needs to make a motion for continuance. That was Jordan, which we cited. We did that three times. Each of the individual errors, plain or preserved, may or may not be sufficient, but together, and amplified by the rush to judgment, we were receiving discovery disks the last business day before trial. Trial started on Tuesday, the day after Labor Day, and we received discovery disks that Friday. At some point, and especially with no reason not to, we're entitled to sufficient time so that the right to counsel can be appropriately used. And in this case... Time is expired, counsel. Time is expired. Thank you. All right. Well, thank you, counsel, for your arguments, and Mr. Finn, I see you were appointed by the court to represent Mr. Chalker. The court thanks you for your service. I'm sorry, Judge, I didn't hear what you said, but thank you all for your time. Okay. Thank you for your service as court-appointed counsel for Mr. Chalker. Thank you, Your Honor. Okay. And thank you, Ms. Vickery. And we will move to the next argument.